# EXHIBIT A

17-512-bk
A & G Goldman P'ship v. Picard

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of June, two thousand eighteen.

PRESENT:   PIERRE N. LEVAL,
     GERARD E. LYNCH,
     CHRISTOPHER F. DRONEY,
       *Circuit Judges*.

_____

IN RE: BERNARD L. MADOFF INVESTMENT SECURITIES LLC,
    *Debtor*.

_____

A & G GOLDMAN PARTNERSHIP, PAMELA GOLDMAN,
    *Appellants*,

      v.          No. 17-512-bk

IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, CAPITAL GROWTH COMPANY, DECISIONS INCORPORATED, FAVORITE FUNDS, JA PRIMARY LIMITED PARTNERSHIP, JA SPECIAL LIMITED PARTNERSHIP, JAB PARTNERSHIP, JEMW PARTNERSHIP, JF PARTNERSHIP, JFM INVESTMENT COMPANIES, JLN PARTNERSHIP, JMP LIMITED PARTNERSHIP, JEFFRY M. PICOWER SPECIAL CO., JEFFRY M. PICOWER P.C., THE PICOWER FOUNDATION, THE PICOWER INSTITUTE FOR MEDICAL RESEARCH, THE TRUST F/B/O GABRIELLE H. PICOWER, BARBARA PICOWER,

1

individually and as Executor of the Estate of Jeffry M. Picower, and as Trustee for the Picower Foundation and for The trust f/b/o Gabrielle H. Picower,
*Appellees.*

---

| | |
|---|---|
| FOR APPELLANTS: | JOSEPH G. GALARDI, (James W. Beasley, Jr., *on the brief*), Beasley Kramer & Galardi, P.A., West Palm Beach, FL. |
| | Joshua J. Angel, Herrick Feinstein LLP, New York, NY. |
| FOR APPELLEE TRUSTEE: | DEBORAH H. RENNER (Thomas D. Warren, David J. Sheehan, Ferve E. Ozturk, Samuel M. Light, *on the brief*), Baker & Hostetler LLP, New York, NY. |
| FOR APPELLEES THE PICOWER PARTIES: | GARY STEIN (Marcy Harris, William D. Zabel, Michael Kwon, Jennifer M. Opheim, *on the brief*), Schulte Roth & Zabel LLP, New York, NY. |

Appeal from a January 25, 2017, judgment of the United States District Court for the Southern District of New York (Woods, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

This appeal arises from the Securities Investor Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), the entity through which Bernard Madoff perpetrated his infamous Ponzi scheme. Appellants A & G Goldman Partnership and Pamela Goldman filed a complaint (the "complaint") in the United States District Court for the Southern District of Florida (the "Florida action"), bringing a securities fraud claim under § 20(a) of the Securities Exchange Act of 1934 against the late Jeffry Picower's estate and several entities associated with Picower (together, the "Picower Parties"). *See Picard v. A & G Goldman P'ship*, 546 B.R. 284, 288 (Bankr. S.D.N.Y. 2016) ("*Bankruptcy Op.*"). Appellees—the Picower Parties and Irving H. Picard, the Trustee in the SIPA liquidation—filed adversary proceedings in the SIPA liquidation to

enjoin the Florida action, contending that it violated a permanent injunction and the automatic stay issued in the SIPA liquidation. *Id.* The bankruptcy court in the Southern District of New York agreed and enjoined the Florida action, *id.*, which the district court affirmed, *A & G Goldman P'ship v. Capital Growth Co. (In re BLMIS)*, 565 B.R. 510, 526–27 (S.D.N.Y. 2017). This appeal followed. We assume the parties' familiarity with the underlying facts, the record of the prior proceedings, and issues on appeal, and repeat them here only as necessary to explain our decision to affirm.

The Madoff Ponzi scheme has been described in detail elsewhere. *See Sec. Inv'r Prot. Corp. v. BLMIS (In re BLMIS)*, 424 B.R. 122, 126–32 (Bankr. S.D.N.Y. 2010). As is relevant here, Madoff claimed he was investing BLMIS's customers' funds in stocks and then hedging with option trades. *In re BLMIS*, 654 F.3d 229, 231 (2d Cir. 2011). In reality, Madoff never invested any of the funds. *Id.* Instead, BLMIS generated fictitious account statements reflecting trades that were never actually completed and profits that were never actually generated. *Id.* at 231–32. Because BLMIS was not actually generating profit, it paid customers who withdrew funds with the proceeds of other customers' investments. *Id.* at 232. Eventually, BLMIS was unable to meet its customers' demands for withdrawals, and the scheme collapsed. *Id.*

On May 12, 2009, the Trustee filed an adversary proceeding in the SIPA liquidation against the Picower Parties seeking to recover $6.7 billion in withdrawals Picower made from BLMIS and bringing claims for fraudulent transfer, avoidable preferences, and turnover under both the Bankruptcy Code and New York law. The Trustee alleged that Picower benefited from BLMIS's Ponzi scheme and either knew or should have known that BLMIS's trading activity was fictitious and that BLMIS was perpetrating a fraud. To support its contention that Picower either knew or should have known about the fraud, the Trustee's complaint cited Picower's close relationship with Madoff and knowledge of BLMIS's operations, Picower's direction of the activity in his own accounts with BLMIS and knowledge that his accounts reflected backdated trading, and the implausibly high rates of return Picower received on his purported investments.

The Trustee and the Picower Parties reached a settlement, which the bankruptcy court approved in an order dated January 13, 2011. The Picower Parties agreed to forfeit over $7.2 billion to the government for distribution to Madoff's victims, $5 billion of which would be returned directly to the BLMIS estate. The bankruptcy court also issued a permanent injunction (the "injunction"), which provided in relevant part:

> [A]ny BLMIS customer or creditor of the BLMIS estate who filed or could
> have filed a claim in the liquidation, anyone acting on their behalf or in

3

> concert or participation with them, or anyone whose claim in any way arises
> from or is related to BLMIS or the Madoff Ponzi scheme, is hereby
> permanently enjoined from asserting any claim against the Picower BLMIS
> Accounts or the Picower Releasees that is duplicative or derivative of the
> claims brought by the Trustee, or which could have been brought by the
> Trustee against the Picower BLMIS Accounts or the Picower Releasees . . .
> .

J. App. at 212.

Appellants, former BLMIS customers and now creditors of the BLMIS estate, filed the complaint in the Florida action on August 28, 2014. That complaint is Appellants' third attempt to hold the Picower Parties liable under § 20(a), and it is the third time that the bankruptcy court has enjoined Appellants from proceeding under the injunction. This case is the first opportunity we have had to rule on the issue with respect to these particular appellants.

Appellants' first action against the Picower Parties (initiated by a motion to the bankruptcy court seeking a determination that nearly identical draft class action complaints, one by each of the Appellants, against the Picower Parties would not run afoul of the injunction) alleged that BLMIS's Ponzi scheme constituted securities fraud in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Appellants sought to hold the Picower Parties jointly and severally liable under § 20(a) of the Exchange Act for BLMIS's underlying securities fraud because Picower allegedly controlled BLMIS.

In an attempt to demonstrate Picower's control of BLMIS, the draft complaints alleged as follows: Picower invested with BLMIS since at least the 1980s, lived near Madoff in Florida, and was closely associated with him both in business and socially for decades. Picower "was able to control BLMIS and use BLMIS as 'a personal piggy bank' by withdrawing funds for various entities he controlled," including "funds . . . belong[ing] to other BLMIS customers . . . ." J. App. 339–40. He became a control person "from at least December 1995," when he began "direct[ing] BLMIS to prepare fraudulent trading records and fraudulent trading results, which effected returns in [his] accounts based upon transactions which in fact never took place." J. App. 339–40. He would then "transfer proceeds from these purported transactions to his own account and then to third party bank accounts which he controlled." J. App. 340.

4

These allegations pertained to Picower's activity in his own accounts at BLMIS. For example, the draft complaints highlighted Picower's withdrawal of $6 billion from one of his BLMIS accounts, falsely labeled a margin loan, when that account "had no trading activity or cash or related assets to support such borrowing." J. App. 341.

The bankruptcy court found, and the district court agreed, that the draft complaints did not allege securities claims under § 20(a); rather, aside from general, conclusory allegations that Picower controlled BLMIS, they "plead[ed] nothing more than that the Picower [Parties] fraudulently withdrew money from BLMIS" and were thus "deceptively labeled fraudulent conveyance claims." *A & G Goldman P'ship v. Picard*, No. 12-cv-6109, 2013 WL 5511027, at *7, *10 (S.D.N.Y. Sept. 30, 2013) ("*Goldman I*"). As such, the *Goldman I* claims were derivative of the Trustee's fraudulent transfer claims against the Picower Parties and were thus barred by the injunction. *See id.* at *9–10. Appellants did not appeal from the district court's ruling.

Appellants then brought a second action against the Picower Parties under a complaint making many of the same allegations as the draft complaints in *Goldman I*, and further alleging that Picower knew and intended that the fictitious trading in his own accounts would result in BLMIS disseminating other fictitious information to other investors. The bankruptcy court held that the new allegations did not render Appellants' claim any less derivative of the Trustee's fraudulent transfer claims than were the allegations in the *Goldman I* draft complaints. *See Picard v. Marshall (In re BLMIS)*, 511 B.R. 375, 393–94 (Bankr. S.D.N.Y. 2014) ("*Goldman II*"). Appellants initially appealed from the bankruptcy court's decision in *Goldman II*, but withdrew the appeal and filed the Florida action instead. *See Fox v. Picard (In re BLMIS)*, 531 B.R. 345, 350 n.3 (S.D.N.Y. 2015).

The complaint in the Florida action—the operative complaint for purposes of this appeal—makes many of the same allegations as the draft complaints at issue in *Goldman I* and the complaint in *Goldman II*, and further alleges two categories of conduct by Picower unrelated to his own BLMIS accounts.

First, Appellants claimed that Picower made what purported to be two loans to BLMIS totaling more than $200 million to help the Madoff Ponzi scheme avoid discovery and collapse (the "propping-up allegations"). The first purported loan, in 1992, involved Picower transferring $76 million in securities to BLMIS without consideration. BLMIS held those securities in a general account and used them to secure a bank loan that it then used to repay investors after one of BLMIS's feeder funds failed. The second purported loan, in April 2006, involved Picower depositing $125 million with BLMIS at when

5

BLMIS was again short on cash to repay its investors. BLMIS repaid Picower in September 2006. Both transactions were completed without formal loan documents and were not disclosed to the Financial Institution Regulatory Authority ("FINRA"). The complaint alleged that these purported loans gave Picower control over BLMIS because his ability to withdraw or refuse the loans would have resulted in BLMIS's collapse and the discovery of the Ponzi scheme.

Second, Appellants claimed Picower allowed BLMIS to list him in its fabricated books and records as a counterparty for a large volume of fictitious options trading (the "counterparty allegations"). Picower agreed that he would not disclose the fictitious nature of the trading and that he would warn Madoff if regulators or others questioned him about the transactions. The complaint further alleged that this lent credibility to Madoff's and BLMIS's fraudulent representations that they were engaged in a high volume of options trading.

Finally, Appellants allege that Picower knew that the foregoing activity would result in BLMIS's preparation and filing of false financial reports with FINRA, and that such reports would reach BLMIS customers.

"In an appeal from a district court's review of a bankruptcy court decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law *de novo*." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted).[1]

The central question in this appeal is whether the complaint in the Florida action violated the injunction because, despite labeling their claim as a § 20(a) claim for control person liability, Appellants instead brought a disguised fraudulent transfer claim that is derivative of the Trustee's fraudulent transfer claims.

---

[1] There is an apparent tension in our case law regarding the standard of review for the bankruptcy court's determination that the claim at issue in the complaint is derivative of the Trustee's claims. In *Marshall v. Picard (In re BLMIS)*, a case involving the same exact injunction at issue here and a similar procedural posture, we noted that "[t]he standard of review for the grant of a permanent injunction, including an anti-suit injunction, is abuse of discretion." 740 F.3d 81, 87 (2d Cir. 2014) (quoting *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 651 (2d Cir. 2004)) (alteration in original). More recently, in *In re Tronox Inc.*, we articulated the distinction that, although the lower court's interpretation of the scope of the injunction was "entitled to deference[,]" the purely legal question of whether the claims at issue were derivative of the trustee's claims was subject to *de novo* review. 855 F.3d 84, 99 & n.20 (2d Cir. 2017). We need not resolve this apparent tension, however, because we would affirm the bankruptcy court under the more demanding *de novo* review.

In the bankruptcy context, "derivative claims" are "ones that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy." *Marshall v. Picard (In re BLMIS)*, 740 F.3d 81, 89 (2d Cir. 2014) ("*Marshall*") (internal quotation marks and brackets omitted). "In assessing whether a claim is derivative, we inquire into the factual origins of the injury and, more importantly, into the nature of the legal claims asserted." *Id.* The way a claim is labeled is "not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy." *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017). By contrast, "when creditors have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Id.* at 99 (internal quotation marks and alterations omitted). "Whereas a derivative injury is based upon a secondary effect from harm done to the debtor, an injury is said to be particularized when it can be directly traced to the third party's conduct." *Id.* at 100 (internal quotation marks and brackets omitted).

Fraudulent transfer is a claim commonly arising in bankruptcy proceedings. A bankruptcy trustee "may recover [from the initial transferee], for the benefit of the estate," property fraudulently transferred within the meaning of 11 U.S.C. § 548.[2]  11 U.S.C. § 550(a). Fraudulent transfer is "perhaps the paradigmatic example of a claim that is 'general' to all creditors" in bankruptcy; thus, it is "usually brought by the trustee, for the benefit of all creditors" and "seek[s] to recover property of the estate." *Marshall*, 740 F.3d at 91 (quoting *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 n.9 (5th Cir. 2008)).

By contrast, a claim under § 20(a) is a securities fraud claim that is particularized to the injured party or parties. Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[2]  Property is fraudulently transferred if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted[,]" 11 U.S.C. § 548(a)(1)(A), or "received less than a reasonably equivalent value in exchange for such transfer" and one of a number of other requirements is met, *id.* § 548(a)(1)(B).

15 U.S.C. § 78t(a). The elements of a § 20(a) claim are "(1) a primary violation [of the securities laws] by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). SEC regulations define "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; *accord Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996).

In determining whether the complaint in the present case is barred by the injunction, we agree with the parties that the appropriate inquiry is not whether the complaint would survive a motion to dismiss pursuant to Rule 12(b)(6). However, the substance of the allegations is relevant insofar as it helps us to determine whether, despite the label Appellants attach to it, the claim asserted is actually a disguised fraudulent transfer claim that is derivative of the Trustee's fraudulent transfer claim. *See Tronox*, 855 F.3d at 100.

Appellants claim that the Picower Parties are liable under § 20(a) because BLMIS was the primary violator of the securities laws, Picower was a control person of BLMIS, and Picower was a direct participant in BLMIS's fraud. The facts as alleged, however, do not give rise to a colorable claim that Picower controlled BLMIS. The substance of the allegations, therefore, still amounts only to a derivative, fraudulent transfer claim.

Appellants do not allege that Picower had the "power to direct or cause the direction of the management and policies of a person . . . through the ownership of voting securities [or] by contract." 17 C.F.R. § 230.405. Thus, they must establish that Picower had such power by other means. *See id.* They have failed to do so.

Excepting the propping-up and counterparty allegations, the gravamen of the present complaint, like that of the previous complaints, is that Picower effected a number of withdrawals constituting fraudulent transfers from BLMIS to himself, causing BLMIS to falsify its records to hide these transfers from other investors. As we held in *Marshall*, such allegations "plead nothing more than that the Picower [Parties] fraudulently withdrew money from BLMIS." *Marshall*, 740 F.3d at 92 (quoting *Goldman I*, 2013 WL 5511027, at *7). Indeed, Picower's alleged actions with respect to his own withdrawals merely injured the estate by removing assets that could have been used to repay other creditors and investors in the SIPA liquidation. *Id.* at 92–93. Thus, any resulting injury to Appellants from Picower's removal of assets would be "inseparable from, and predicated upon, [the] legal injury to the estate." *Id.* at 92. Moreover, these allegations demonstrate no control

over the "management and policies" of BLMIS. 17 C.F.R. § 230.405. Rather, they show Picower purportedly caused BLMIS to transfer money to the Picower Parties and then generate fake records reflecting fake trading activity. But in Madoff's Ponzi scheme, *any* investor who withdrew money necessarily caused BLMIS to transfer money to the investor and then generate fake records. Thus, these allegations do not meet the "control" requirement of § 20(a).

Nor do the propping-up or counterparty allegations demonstrate that Picower controlled BLMIS within the meaning of § 20(a), under either of the two theories Appellants advance.

First, the complaint asserts that Picower's contributions to the Ponzi scheme allowed the scheme to continue, and that, had he chosen not to assist BLMIS, the scheme would have collapsed earlier than it did. But Appellants make only conclusory allegations that Picower ever leveraged his allegedly important role in the scheme to direct the "management and policies" of BLMIS, 17 C.F.R. § 230.405, and it is not reasonable to infer that Picower had that kind of influence merely because he could have caused BLMIS to collapse earlier than it did.[3]

Second, Appellants contend that the propping-up and counterparty allegations demonstrate Picower's "ability to direct the creation and dissemination of false and misleading trading and financial documentation" because he knew his participation would result in false information being incorporated into BLMIS's financial disclosures. J. App. 462 ¶ 94. But these allegations demonstrate only Picower's understanding that his participation would result in the dissemination of false information, not that he actually directed that the dissemination of false information occur or otherwise had "control of the

---

[3] This distinguishes the present case from the cases that Appellants cite for the proposition that a lender may acquire control under § 20(a). In *Mecca v. Gibraltar Corp. of America*, the court held that a reasonable jury could find that the lender, Gibraltar, controlled the primary securities law violator, Contreras, based on multiple examples of Gibraltar using its leverage over Contreras to influence his actions. 746 F. Supp. 338, 342 (S.D.N.Y. 1990). For example, after Gibraltar threatened to report Contreras's misconduct to law enforcement, Contreras allowed Gibraltar to place several people in supervisory roles in Contreras's business, and agreed to terms on certain transactions at Gibraltar's behest despite his belief that it would hurt relations with his most important customer. *Id.* Likewise, the lenders in *In re Falstaff Brewing Corp. Antitrust Litigation* evinced control by requiring the primary violator to "(1) replace acting officers and directors; (2) implement certain policies; (3) revise its debt structure; (4) obtain an equity investor; (5) give additional security; and (6) obtain approval before acquiring or selling capital assets." 441 F. Supp. 62, 65 (E.D. Mo. 1977). The complaint in this case lacks similar examples of Picower actually using whatever influence he may have obtained by allegedly assisting in the Ponzi scheme to direct the management and policies of BLMIS.

primary violator" of the securities laws. *ATSI Commc'ns, Inc.*, 493 F.3d at 108. The creation and dissemination of such false information was a basic and continuing feature of Madoff's Ponzi scheme; Appellants allege no facts suggesting that Picower directed or originated that practice.

Ultimately, the "control" allegations in the complaint amount to nothing more than an attempt to "plead around" the injunction. *Marshall*, 740 F.3d at 96. Because the complaint does not assert a colorable § 20(a) claim, and identifies no other legal theory under which Picower's alleged conduct directly injured Appellants, rather than the BLMIS estate, the "nature of the legal claim[]" that remains is, once again, that of a fraudulent transfer claim.[4] *Tronox*, 855 F.3d at 100 (internal quotation marks omitted). That claim is clearly derivative of the Trustee's settled fraudulent transfer claim against Picower and is barred by the injunction. *See Marshall*, 740 F.3d at 92.

Appellants rely heavily on our decision in *Picard v. JPMorgan Chase & Co. (In re BLMIS)*, another case from the BLMIS liquidation proceedings, to argue that their § 20(a) claim belongs to the investors, not the Trustee, and thus is not derivative. 721 F.3d 54 (2d Cir. 2013). Appellants point to similarities between the allegations in the operative complaint about Picower's conduct and the allegations in *JPMorgan* to argue that Picower's actions harmed creditors directly, rather than the BLMIS estate. That reliance is misplaced.

*JPMorgan* did not involve § 20(a) claims. In that case, the Trustee sought to hold several financial institutions responsible for assisting Madoff when they knew or should have known he was running a Ponzi scheme. *See id.* at 57–58. The Trustee brought claims for common law unjust enrichment, breach of fiduciary duty, aiding and abetting fraud, and negligence. *See id.* at 58. We held that such claims sought to recover money owed directly to creditors, not to the estate, and thus they belonged to the injured creditors,

---

[4] We reject Appellants' contention that they have pleaded a bona fide § 20(a) claim, rather than a fraudulent transfer claim, merely because the complaint alleges the Picower Parties took actions beyond "directing fictitious trades in, and withdrawing proceeds from, their own BLMIS accounts." Appellants' Br. at 27 (quoting *Goldman I*, 2013 WL 5511027, at *6). The language from *Goldman I* quoted in Appellants' brief indicates only the district court's reasoning as to why the particular complaints before the court were disguised fraudulent transfer claims. *Goldman I*, 2013 WL 5511027, at *6–8. *Goldman I*—which is not binding on this Court—did not, as Appellants assert, set forth a comprehensive test for determining the difference between a bona fide § 20(a) claim and a disguised fraudulent transfer claim, or hold that a § 20(a) claim is bona fide so long as it alleges any conduct at all that goes beyond the fraudulent withdrawal of funds and the necessary steps to effect or document such withdrawals. Thus, adding the propping-up and counterparty allegations, which do not demonstrate Picower's control, does not transform Appellant's disguised fraudulent transfer claim into a control person claim under § 20(a).

not to the Trustee. *See id.* at 67. In doing so, we determined that the defendants' alleged actions had not harmed all of BLMIS's customers in the same way; rather, the Trustee's claims sought to vindicate harms to "thousands of customers" caused by "financial institutions [by] their handling of individual investments made on various dates in varying amounts." *Id.* at 71.

An important difference between *JPMorgan* and the present case is that the only theory of liability Appellants have pursued against the Picower Parties is control person liability. The claims in *JPMorgan* sought to hold financial institutions liable directly for the harms their own actions caused to the investors. *See JPMorgan*, 721 F.3d at 57–58. By contrast, Appellants' claim seeks to hold the Picower Parties responsible for the harms BLMIS's fraud caused. A § 20(a) claim seeks to hold the control person jointly and severally liable for the "primary violation" of the securities laws by the controlled person, so long as the control person is a "culpable participant" in the fraud. *ATSI Commc'ns, Inc.*, 493 F.3d at 108. Here, BLMIS, not the Picower Parties, is alleged to have violated the securities laws—specifically § 10(b) of the Exchange Act and Rule 10b-5—and thus the harm alleged is that BLMIS defrauded Appellants as investors. Under a § 20(a) theory of liability, the legal significance of Picower's alleged actions facilitating the Ponzi scheme is not that Picower's own actions directly harmed Appellants, but instead that they demonstrated Picower's control and culpable participation in BLMIS's fraud, such that the Picower Parties can legally be held jointly and severally liable for the harms BLMIS caused. Thus, any similarities between the financial institutions' alleged conduct and resulting harm in *JPMorgan* and Picower's alleged conduct and resulting harm here are irrelevant to the question of whether Appellants' claim is direct or derivative.

The only harm alleged in the operative complaint that Appellants have legally attributed to the Picower Parties is, as in the preceding complaints, for fraudulent withdrawal of assets from the estate. That is a derivative claim, which is barred by the injunction.

\* \* \*

11

We have considered Appellants' remaining arguments and conclude that they are without merit.   Accordingly, we **AFFIRM** the judgment of the district court.[5]

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

_____

[5]  We decline the Picower Parties' request to enjoin Appellants from filing further complaints against the Picower Parties.   The bankruptcy court declined to impose such an injunction, *Bankruptcy Op.*, 564 B.R. at 306, and the Picower Parties did not pursue this request on appeal to the district court.   The Picower Parties also did not cross-appeal to this Court from the denial of this injunction.